**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**LLEWELLYN GEORGE, 02-A-0092,**

                                    **Plaintiff,**                    **05-CV-0788A(Sr)**

**v.**

**GLENN S. GOORD, et al.,**

                                    **Defendants.**

---

## REPORT, RECOMMENDATION AND ORDER

              This case was referred to the undersigned by the Hon. Richard J. Arcara,

pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon

dispositive motions.  Dkt. ##10 and 11.


              Plaintiff filed this *pro se* action on or about November 3, 2005, seeking

relief pursuant to 42 U.S.C. § 1983.  Dkt. #1.  Plaintiff alleges that while an inmate at

the Attica Correctional Facility, his rights pursuant to the First, Eighth, and Fourteenth

Amendments to the United States Constitution were violated.  *Id*.  Currently before the

Court are plaintiff's motion for summary judgment (Dkt. #22) and defendants' cross-

motion for summary judgment (Dkt. #52).  For the following reasons, it is recommended

that plaintiff's motion for summary judgment be denied and defendants' cross-motion

for summary judgment be granted in part and denied in part.

## BACKGROUND

Plaintiff, proceeding *pro se*, commenced this action on or about

November 3, 2005, against defendants Glenn S. Goord, Thomas G. Eagen, James T.

Conway, Randy James, Jeffrey Bea, Darryl Borawski, Sandra Dolce, Theresa Dyson,

Rabbi S. Charitonow, Don Lopes, Edwin Hartman, George Struebel, Jeffrey Bishop,

Lisa Trapasso, John Doe (Chief Psychiatrist), Thomas Edwards, and Vincent Rebl,

alleging violations of his rights pursuant to the First, Eighth and Fourteenth

Amendments to the United States Constitution while he was housed at the Attica

Correctional Facility ("Attica").  On plaintiff's first claim, he seeks $15,000 in

compensatory damages and $9,000 in punitive damages and on his second claim, he

seeks $125,000 in compensatory damages and $175,000 in punitive damages.  It bears

noting that plaintiff has also filed a separate action against several of the same

defendants named herein, entitled *Llewellyn George v. James Conway, et al.*, Case No.

05-CV-510.  That case is also pending before Chief United States District Judge

Richard J. Arcara and has been referred to the undersigned for the handling of all

pretrial matters and to hear and report on dispositive motions.  This Court issued its

Report, Recommendation and Order with respect to cross-motions for summary

judgment in *Llewellyn George v. James Conway, et al.*, on March 25, 2009.

In his first claim, plaintiff alleges that from July 27, 2005 to July 30, 2005,

defendants James Conway, Sandra Dolce, Darryl Borawski, Thomas Edwards and Don

Lopes "are all responsible for keeping plaintiff on a restricted diet and deprived of all

kosher meals, for three days. Plaintiff was served with a deprivation order seven days later, and was never examined by medical staff, prior to being placed on restricted diet, as is required" in violation of his rights pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution. Dkt. #1, p.12. In his second claim, plaintiff alleges that beginning on August 9, 2005, defendants "Glenn S. Goord, Thomas Eagen, James Conway, Sandra Dolce, Theresa Dyson, George Struebel, Edwin Hartman, Rabbi S. Charitonow, John Doe (Chief Psychiatrist), Lisa Trapasso, and Don Lopes"[1] violated his rights pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff's second claim states,

> [e]ach of the defendants had seen [sic] plaintiff living in a filthy stripped cell, behind an unauthorized cell shield for nine days, during their rounds, except for Mr. Lopes, yet, refused to address the violations. I was denied exercise from 8-9-05 to 9-27-05, cell cleaning supplies to remove dried-up feces, urine and food from the sink, toilet and plexiglass cell shield, toothpaste, toothbrush, running water in the cell, soap, toilet paper, light in the cell, hot water and personal property for nine days, including no showers.
>
> There were no black officers assigned to the 7:00 am - 3:00 pm tour, in the Special Housing Unit, yet this type of hair along with other types of hair were always found in my kosher trays.

---

[1] Plaintiff's complaint lists seventeen defendants in the caption (sixteen named and one "John Doe"). Although defendants note in their motion for summary judgment that Don Lopes and Rabbi S. Charitonow were never served with process in this action, neither defendant Lopes nor defendant Charitonow have moved to dismiss the complaint on that basis. *See* Dkt. #53, p.2, n.1. Additionally, although defendants James and Rebl were listed in the caption, with the exception of mention in the attachments to the complaint, the complaint does not contain specific allegations against these individuals. Finally, the caption lists Jeffrey Bea as a defendant, however, neither the complaint nor the attachments to the complaint mention Jeffrey Bea. Notwithstanding the foregoing, Jeffrey Bea filed an answer to the complaint. Dkt. #7.

Mr. Lopes, failed his duties to enforce hygenic [sic] policies which governs [sic] food handling.

Officer Hartman repeatedly gave me empty food containers, whenever I complained about the conditions of my food. Mr. Goord, and Mr. Eagen both were fully aware of my problems with prison staff, but failed to address the violations, adequately.

I was deprived of sleep and mental health treatment, after prison staff move me from a relatively quiet area, and placed [sic] amongst prisoners with known psychological issues, that kick and bang on the walls and bars, all day and all night, and play with their own feces.

Dkt. #1, pp.22-23.


**Restricted Diet**

There is no dispute that at all times relevant to the instant motion, plaintiff was approved for and participating in the Cold Alternative Diet ("CAD"), also known as kosher, meal plan. On July 27, 2005, plaintiff refused to turn in his utensils following either the noon or evening meal.[2] A misbehavior report was issued and plaintiff was placed on a restricted diet until July 30, 2002. Dkt. #53, ¶ 2. Directive 4933 §

---

[2]Although not materially significant to the determination of the instant motions, the Court notes that the majority of the affidavits submitted by defendants in support of their motion for summary judgment with respect to plaintiff's refusal to turn in his utensils state that plaintiff failed to turn in his utensils following the noon meal. However, at least one affidavit and defendants' Statement of Undisputed Facts state that plaintiff refused to turn in his utensils following the evening meal. *See* Dkt. #62 (Affidavit of Randy James), ¶ 11 (noon meal); Dkt. #68 (Affidavit of Don Lopes), ¶ 14 (noon meal); Dkt. #70 (Affidavit of Sandra Dolce), ¶ 5 (noon meal); Dkt. #71 (Affidavit of Darryl Borawski), ¶ 19 (noon meal); Dkt. #73 (Affidavit of Thomas Edwards), ¶ 4 (noon meal); *but see*, Dkt. #67 (Affidavit of James Conway), ¶ 14 (evening meal); Dkt. #53 (Statement of Undisputed Facts), ¶ 2 (evening meal).

304.2(b)(3) provides that an inmate may be placed on a restricted diet when, *inter alia*, an inmate refuses to obey a direct order to return a food container or utensil at the conclusion of a meal while assigned to the Special Housing Unit ("SHU"). Dkt. #53, ¶ 2; Dkt. #67, p.64. Defendant Randy James, then the Deputy Superintendent of Security at Attica, authorized plaintiff's placement on a restricted diet from July 27, 2005 to July 30, 2005. Dkt. #62, ¶ 11. The applicable regulations provide that the Superintendent or his designee "may issue a written order placing an inmate reported to have engaged in conduct described in subdivision (b) of this section on a restricted diet for no more than seven days pending the outcome of the inmate's superintendent's hearing." Dkt. #67, p.64. The regulations further provide that "[a] physician, nurse, or physician's assistant, designated by the facility heath services director, must examine the state of health of the inmate within 24 hours of the commencement of the restriction and daily thereafter during the period of restriction." *Id.*

On or about July 27, 2005, defendant James completed a Pre-Hearing Restricted Diet Order, stating that plaintiff was placed on a restricted diet from July 27, 2005 to July 30, 2005, because "on 7-27-05, you refused to turn in any utensils from the noon meal, which consist [sic] of tray made of styrafome [sic], styrafom [sic] cup and a spork." Dkt. #62, p.31. According to the Pre-Hearing Restricted Diet Order, the placement of plaintiff on a restricted diet was approved by "PA Edwards" at 2:10 pm. Defendant Thomas Edwards, a Physician's Assistant at Attica, reviewed plaintiff's medical records and medically approved the restricted diet on July 27, 2005 at 2:10 pm. Dkt. #73, ¶ 6. Moreover, defendant Edwards made a notation in plaintiff's medical

records that he was medically cleared for a restricted diet.  *Id*.  Plaintiff alleges that he

was never examined by medical staff prior to being placed on a restricted diet.  Dkt. #1.

In response, defendant Edwards states,

> [p]ursuant to 7 NYCRR § 304.2(f) and Directive #4933 §
> 304.2(f), the examination into the state of health of the
> inmate must be completed within 24 hours of the
> commencement of the restriction and daily thereafter during
> the period of restriction.  The NYCRR and Directive #4933
> do not require a physical examination prior to being placed
> on a restricted diet as alleged by Inmate George.

Dkt. #73, ¶ 7.  According to defendant Edwards, plaintiff was examined on a daily basis

after the restricted diet commenced and there were no adverse effects of the diet

noted.  *Id*. at ¶ 8.


        In support of his motion for summary judgment, plaintiff alleges that for

the three days when he was placed on a restricted diet, he was served non-kosher

"nutri-loaves."  Dkt. #23, ¶ 4.  Documentary evidence submitted by defendants with

respect to the instant motions reveals that plaintiff refused the restricted diet on July 28,

2005 and July 29, 2005, and that plaintiff came off the restricted diet on July 30, 2005

and resumed eating at that time.  Dkt. #67, p.61.  Defendants maintain that at the time

plaintiff was placed on a restricted diet, July 27, 2005 to July 30, 2005, no kosher loaf

was available at Attica.  Dkt. #53, ¶ 4.  Indeed, defendants submit that Attica did not

begin receiving the kosher loaf for the restricted diet until September 9, 2005.  *Id*.  In

sharp contrast, plaintiff maintains that,

> [d]efendants C. Edwards, Rosolowski, Charitonow, and
> Lopes, were fully aware of the fact that there had never
> been a healthy alternative for kosher foods, and had never

made a genuine effort to provide plaintiff with an alternative
to the non-kosher nutri-loaves.  Contrary to the defendants
[sic] bald assertions, kosher loaves were readily available,
from the same facility that produces the nutri-loaves for the
other prisoners in every other state prisons [sic], that were
on the restricted diet.  The nutri-loaves are made the
Eastern Correctional Facility then shipped to other prisons.

Dkt. #76, pp.12-13.


## Grievance #A-49185-05

On or about August 5, 2005, plaintiff filed Grievance #A-49185-05 (in the

form of a letter to defendant Theresa Dyson, formerly the Inmate Grievance Program

Supervisor at Attica), concerning his placement on a restricted diet.  Dkt. #66, ¶ 14 and

Exhibit D.  Specifically, plaintiff states, in part:

> [b]etween the evening of 7-27-05 and the evening of 7-30-
> 05, I was placed on a restricted [sic], the loaf, by S.H.U.
> staff, but was never seen by medical staff, nor were [sic] I
> served with an [sic] deprivation order.  Action requested by
> grievant, is for the I.G.R.C. to review the "original"
> audio/video for surveillance cameras #25 and #26 showing
> the serving of each meal between 7-27-05 and 7-30-05, as
> well as checking to confirm whether food service and
> medical were notified.

Dkt. #66, p.60.  In response, the Inmate Grievance Review Committee ("IGRC")

advised plaintiff that Directive 4933 § 304.2(f) provides that Health Services and Food

Services shall be notified in advance of the imposition of a restricted diet.  Moreover,

the IGRC recommended that the action requested be denied insofar as the Inmate

Grievance Program is not intended to support an adversarial process. In addition, the

IGRC does not have the authority to review the SHU cameras.  Finally, the IGRC stated

that plaintiff was provided with a copy of the Order placing him on a restricted diet and

-7-

that the restricted diet was forwarded to him and approved by defendant Edwards following a review of his medical file. Dkt. #66, ¶ 14 and p.58. Thereafter, on or about August 15, 2005, defendant Superintendent Conway denied plaintiff's grievance stating "[y]ou were appropriately placed on an authorized restricted diet which was also reviewed by medical staff and a signed copy forwarded to you." Dkt. #67, ¶ 15 and p.66.

**Grievance #A-49264-05**

On or about August 9, 2005, plaintiff slipped his restraints during a Tier Hearing. Dkt. #53, ¶ 7; Dkt. #70, ¶ 10. As a result of this conduct, plaintiff was moved from cell BW-22 on the second floor of the SHU to cell CW-18 on the third floor of the SHU. *Id*. Cells on the third floor of the SHU have lexon[3] on the stationary side of the cell and wire mesh on the door. *Id*. Even though there is lexon covering part of the cell, inmates are not considered to be behind a cell shield unless the door is also covered by lexon. *Id*. During his period of confinement in cell CW-18, plaintiff was neither behind a cell shield nor was a cell shield ordered for that cell. Dkt. #53, ¶¶ 7-9. The procedures governing the use of cell shields are outlined in 7 NYCRR § 305.6 and DOCS Directive #4933 - Special Housing Units § 30.6. Dkt. #53, ¶ 8. Specifically, the procedures require the use of a written cell shield order. *Id*. Because there was no cell shield ordered or installed in cell CW-18 during plaintiff's period of confinement in that cell, there is no paperwork, as required by the procedures, concerning a cell shield. *Id*. at

---

[3] "Lexon" is a material similar to plexiglass, but more durable.

¶ 9.  Accordingly, at no time during the period of plaintiff's confinement in cell CW-18, was there a cell shield in place.  *Id*. at ¶ 11.  All of plaintiff's property, including his hygienic supplies, was packed up and brought to him.  *Id*. at ¶ 12.  Plaintiff refused delivery of his property and wanted to be removed from cell CW-18 and have all of his property examined in front of him.  *Id*.  To grant such a request would have been against procedure.  *Id*.  Despite daily attempts to deliver plaintiff's property, plaintiff continued to refuse delivery unless his requests were satisfied.  *Id*.

On or about August 15, 2005, plaintiff filed Grievance #A-49264-05 (in the form of a letter addressed to defendant Theresa Dyson) alleging that he had been deprived of his personal property.  Dkt. #53, ¶ 13; Dkt. #66, ¶ 15 and p.69.  Specifically, in his letter to defendant Dyson, plaintiff states, in part,

> [w]hile I was attending a tier 3 disciplinary hearing on 8-9-05, my personal property and legal work were confiscated and destroyed by C.O. Kintzel and another officer, during a retaliatory cell frisk.  C.O. Kintzel had threatened me with bodily harm, as he escorted me to the exercise yard, earlier that day, because of my past and current grievances.  The incident occurred in 22 cell, on the BW company in the Special Housing Unit.  I was then taken to the third floor of the S.H.U. and placed in a stripped/modified cell, behind a cell sheild [sic], as per Sgt. Erhart's orders.  It's been six days since I've been denied my personal property, linens, light, running water, toilet paper, toothbrush, toothpaste, showers, exercise, hot water, cell cleaning supplies and law library services.
>
> * * *
>
> Action requested by grievant is for the unauthorized and unconstitutional deprivations to be lifted, and for the surveillance audio/video tapes for C.W. company, dated 8-9-05, 8-10-05, 8-11-05, 8-12-05, 8-13-05, 8-14-05, 8-15-05

and until this grievance have [sic] been filed by I.G.R.C. to
be reviewed then preserved for future use.

Dkt. #66, pp.69-70.  On or about August 24, 2005, the IGRC denied the action

requested by plaintiff on the grounds that it does not have the authority to order security

to release an inmate from a restraint order or deprivation order.  Dkt. #66, ¶ 15 and

p.68.  The IGRC advised plaintiff that the relief requested may only be granted by the

Deputy Superintendent of Security.  *Id*.  The IGRC further advised plaintiff that it could

not review the SHU surveillance tapes.  *Id*.  Finally, the IGRC noted that "upon

investigation grievant's action at his 8/9/05 tier hearing posed a threat to staff, hence

the restraint order.  S.H.U. staff has gone on record to state 'grievant refused his cell

set-up on 8/11/05 and, subsequently accepted everything on 8/17/05.'"  *Id*.  On or about

September 2, 2005, defendant Superintendent Conway denied plaintiff's grievance

stating "[g]rievant's own behavior warranted the restraint order.  No deprivation of

property exists since grievant refused to accept it when originally offered by staff.  After

several days, grievant finally accepted his cell set up."  Dkt. #53, ¶ 15 and p. 66.


On August 16, 2005, plaintiff wrote a letter to defendant Sandra Dolce, the

Deputy Superintendent of Programs at Attica.  Dkt. #70, ¶ 12.  In this letter, plaintiff

stated that it had been seven days since he had been "wrongfully and unlawfully placed

in a stripped cell, behind a cell shield, on 8-9-05, with no light, running water, hot water,

soap, toilet paper, toothbrush, toothpaste, showers, beddings [sic], or exercise, or law

library services without being served any deprivation orders."  Dkt. #70, ¶12 and p.42.

Defendant Dolce forwarded plaintiff's letter to defendant James and defendant Dolce

forwarded a memo to plaintiff on August 18, 2005, advising plaintiff that his letter had been forwarded to defendant James.  Dkt. #70, ¶ 13 and p.44.

On or about August 26, 2005, plaintiff wrote letters to defendants Goord and Eagen, former Commissioner of New York State Department of Correctional Services and former Director of the Inmate Grievance Program, respectively.  Dkt. #56, ¶ 18 and pp.79-83.  In his letters, plaintiff alleged that he had been placed in a stripped cell for nine days behind a cell shield without a deprivation order.  Director Eagen sent plaintiff a standard letter stating that the Inmate Grievance Program does not allow for inmates to submit grievances directly to the Central Office.  *Id*.  Defendant Eagen's letter further stated that plaintiff's documents were returned to him and no copies were retained.  *Id*.

## Grievance #A-49328-05

On or about August 29, 2005, plaintiff filed Grievance #A-49328-05 (in the form of a letter to defendant Dyson) complaining that Corrections Officer Hartman had denied him one meal and that he had been placed behind a cell shield without an order. Dkt. #66, ¶ 16 and pp.76-77.  Plaintiff requested that he be transferred to another cell. *Id*.  On or about September 7, 2005, the IGRC denied plaintiff's grievance stating, "SHU staff has gone on record stating that 'grievant is receiving all his meals.'  I.G.R.C. does not have the authority to order that the surveillance video be preserved, nor can they be reviewed by I.G.R.C. staff.  Nor can I.G.R.C. have grievant moved from one cell to

another." Dkt. #66, ¶ 16 and p.74. Defendant Superintendent Conway similarly denied

plaintiff's grievance on September 14, 2005, stating, "[a]ll of your meals are being given

[sic] you, you were not put in a stripped cell or one with a cell shield. The cell shield

issue was explained to you by the grievance supervisor personally a day or two after

you wrote this grievance." Dkt. #67, ¶ 17 and p.78. Plaintiff appealed defendant

Conway's determination to the Central Office Review Committee ("CORC") and

following a full hearing of the facts and circumstances and a complete investigation,

CORC unanimously upheld the Superintendent's determination. Dkt. #67, ¶ 18 and

p.77.


With respect to Grievance #A-49264-05 and A-49328-05, defendant

Darryl Borawski, then a Sergeant at Attica, investigated plaintiff's complaints and wrote

a memorandum to Lieutenant James Lambert concerning his investigation. Dkt. #71,

¶ 30 and p.85. In his memorandum, defendant Borawski stated that following the

August 9, 2005 tier hearing where plaintiff slipped his restraints, plaintiff was moved to

cell CW-18 and that his property was packed up and brought upstairs wherein plaintiff

refused delivery of his property. Dkt. #71, p.85. Despite repeated efforts to deliver

plaintiff's property to him, plaintiff did not accept delivery of his property until August 17,

2005. *Id*. Thus, defendant Borawski concluded that the situation was entirely one of

plaintiff's own making and further, that it was his choice to refuse delivery of his

property. *Id*. In addition, with respect to plaintiff's allegations that the physical

conditions of the SHU were unsatisfactory, defendant Borawski reviewed all of the

Maintenance Work Order Request forms for the second and third floors of the SHU for

the period May 2005 through August 2005. Dkt. #71, ¶ 31. During that period of time, twelve forms were completed and the maintenance work conducted consisted of repairs to the toilets and sinks due to leaks, clogs and plugs and the installation of a new radiator. *Id*. Thus, according to defendant Borawski, all of the maintenance requests affecting the sanitary conditions in the SHU were addressed and completed in a timely manner. *Id*. at ¶ 32.

**Defendants Jeffrey Bishop, Lisa Trapasso and Vincent Rebl**

For the period August 9, 2005 through September 9, 2005, social workers Jeffrey Bishop and Lisa Trapasso and corrections counselor Vincent Rebl, made weekly rounds in the SHU. Dkt. #53, ¶ 15; Dkt. #58 ¶ 5; Dkt. #60, ¶ 5; Dkt. #61, ¶ 5. The rounds were made with a doctor and would usually consist of greeting or speaking with the inmates. *Id*. Prior to plaintiff's placement in the SHU, defendant Bishop had been plaintiff's therapist. Dkt. #53, ¶ 16; Dkt. #60, ¶ 5; Dkt. #61, ¶ 6. Defendants Bishop and Trapasso did not work with plaintiff during the period of his confinement in the SHU because plaintiff's "mental health status was inactive." *Id*. Defendants Rebl, Trapasso and Bishop maintain that they were neither responsible for nor had any input concerning the conditions of plaintiff's confinement. Dkt. #58, ¶ 6; Dkt. #60, ¶ 6; Dkt. #61, ¶ 8. During their rounds in the SHU, defendants Rebl, Trapasso and Bishop did not view the conditions of confinement about which plaintiff complains. Dkt. #58, ¶¶ 6-7; Dkt. #60, ¶ 7; Dkt. #61, ¶ 9. Moreover, defendants Rebl, Trapasso and Bishop state that they do not recall being contacted by plaintiff to discuss the alleged conditions. *Id*.

Defendants Rebl, Trapasso and Bishop further argue that they did not have any input regarding the property issued to plaintiff in the SHU.  Dkt. #58, ¶ 7; Dkt. #60, ¶ 8; Dkt. #61, ¶ 10.  Finally, defendants Rebl, Trapasso and Bishop assert that they were neither involved in nor part of any determinations made by DOCS officials as to plaintiff, plaintiff's placement/housing within the facility, plaintiff's property or the conditions of plaintiff's confinement. Dkt. #58, ¶ 9; Dkt. #60, 9; Dkt. #61, ¶ 11.

## DISCUSSION AND ANALYSIS

With respect to plaintiff's claims against defendants Glenn S. Goord, Thomas Eagen, James Conway, Vincent Rebl, Lisa Trapasso, and Jeffrey Bishop, defendants argue that they must be dismissed for lack of personal involvement. Moreover, defendants Sandra Dolce, Darryl Borawski and Thomas Edwards each argue that plaintiff's first claim against them alleging violations of the First, Eighth and Fourteenth Amendments in connection with plaintiff's placement on a restricted diet for the period July 27, 2005 to July 30, 2005, must also be dismissed for lack of personal involvement.  Defendants Conway, Dolce, Borawski, Edwards and Lopes further argue that plaintiff cannot establish that his right to free exercise of religion was violated because plaintiff was not deliberately deprived of his kosher meals from July 27, 2005 to July 30, 2005.  Similarly, defendants Conway, Dolce, Borawski, Edwards and Lopes also argue that plaintiff cannot establish that his right to be free from cruel and unusual punishment was violated because plaintiff was placed on a restricted diet.  Defendants Goord, Eagen, Conway, Dolce, Dyson, Struebel, Hartman, Rabbi Charitonow, Trapasso, and Lopes claim that plaintiff's right to be free from cruel and unusual

punishment was not violated by reason of his conditions of confinement. Defendants Goord, Eagen, Conway, Dolce, Dyson, Struebel, Hartman, Rabbi Charitonow, Trapasso and Lopes further argue that plaintiff's claims of being deprived of his kosher meals from July 27, 2005 to July 30, 2005 and living in a filthy cell behind an unauthorized cell shield do not rise to the level of a violation of his rights under the Fourteenth Amendment. Lastly, defendants claim that they are entitled to qualified immunity. Because the instant motions may be addressed on other grounds, this Court need not reach the issue of whether defendants are entitled to qualified immunity. For the following reasons, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be denied in part and granted in part.

## Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*,

140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*,

502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence

of a genuine issue of material fact, the nonmoving party must come forward with

enough evidence to support a jury verdict in its favor, and the motion will not be

defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of

conjecture or surmise."  *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party

seeking to defeat a motion for summary judgment,

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

## Personal Involvement

It is well settled that the personal involvement of defendants in an alleged

constitutional deprivation is a prerequisite to an award of damages under § 1983.

*Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060,1065 (2d Cir. 1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon*, 58 F.3d at 873, *citing Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

### Glenn S. Goord

In his second claim, plaintiff alleges that on August 9, 2005, defendant Goord, among others, saw plaintiff "living in a filthy stripped cell, behind an authorized cell shield for nine days" and that defendant Goord failed to do anything about it, in violation of plaintiff's rights under the Eighth Amendment. Dkt. #1, pp.22-23. At all times relevant to the allegations in the complaint, defendant Goord served as the Commissioner of DOCS and was responsible for the overall management of the Department. Dkt. #72, ¶ 3. The day-to-day management of each of the Department's correctional facilities was overseen by the Superintendent of each facility. *Id*. Commissioner Goord's office routinely receives several thousand letters per year from inmates. *Id*. at ¶ 4. When these letters were received, a member of Commissioner Goord's administrative staff would open the letter and forward the letter to the

appropriate individual, who would respond or take the appropriate, necessary action. *Id*. As discussed above, plaintiff addressed one letter to Commissioner Goord, however, the record before this Court is devoid of any evidence to support the conclusion that Commissioner Goord ever personally read or responded to plaintiff's letter. *Id*. at ¶ 6. Accordingly, because defendant Goord was not personally involved in the alleged constitutional violation, it is recommended that the claim against defendant Goord be dismissed.

### Thomas Eagen

Thomas Eagen, the former Director of the Inmate Grievance Program for DOCS, is named as a defendant in plaintiff's second claim. Plaintiff's claim against defendant Eagen is identical to the claim against defendant Goord. Dkt. #1, pp.22-23. On or about August 26, 2005, plaintiff addressed a letter to defendant Eagen alleging that he had been held in a stripped cell for nine days behind a cell shield without a deprivation order. Dkt. #56, ¶ 18. In response, defendant Eagen sent plaintiff a letter acknowledging receipt of his August 26, 2005 letter and advising plaintiff that the Inmate Grievance Program does not allow for inmates to submit grievances directly to the Central Office. *Id*. at ¶ 18 and p.83. As stated in the letter, plaintiff's documents were returned to him and no copies were retained by defendant Eagen's office. *Id*. The record before this Court reveals that with the exception of the correspondence described above, defendant Eagen simply reviewed the grievances filed by plaintiff and all related documents, in preparation for his defense in this action. However, there is

nothing in the record to support the conclusion that defendant Eagen ever personally investigated or oversaw any of the investigations into plaintiff's grievances. Moreover, the record is equally devoid of any evidence to even suggest that defendant Eagen had any personal contact or interaction with plaintiff at any time. Accordingly, because defendant Eagen was not personally involved in the alleged constitutional violation, it is recommended that the claim against defendant Eagen be dismissed.

### James Conway

Plaintiff alleges that defendant Conway was, in part, responsible for keeping plaintiff on a restricted diet from July 27, 2005 to July 30, 2005 in violation of his rights under the First, Eighth and Fourteenth Amendments. Dkt. #1, p.12. In addition, plaintiff alleges that on August 9, 2005, defendant Conway saw plaintiff living in a filthy stripped cell behind an unauthorized cell shield for nine days and failed to address the violations of his First, Eighth and Fourteenth Amendment rights. Dkt. #1, pp.22-23. Defendant Conway argues that he cannot be held liable simply because of his position as the Superintendent at Attica. Dkt. #55, p.7. Plaintiff filed Grievance #A-49185-05 on August 5, 2005 complaining about being placed on a restricted diet from July 27, 2005 to July 30, 2005. Plaintiff filed two grievances A-49264-05 (August 9, 2005) and A-49328-05 (August 29, 2005), complaining about living in a filthy cell behind an unauthorized cell shield.

The IGRC recommended that the action requested in Grievance No. A-49185-05 be denied insofar as the Inmate Grievance Program is not intended to

support an adversarial process. In addition, the IGRC advised plaintiff that it does not have the authority to review the SHU cameras. Finally, the IGRC stated that plaintiff was provided with a copy of the Order placing him on a restricted diet and that the restricted diet was forwarded to him and approved by defendant Edwards following a review of his medical file. Dkt. #66, ¶ 14 and p.58. Thereafter, on or about August 15, 2005, defendant Superintendent Conway denied plaintiff's grievance stating "[y]ou were appropriately placed on an authorized restricted diet which was also reviewed by medical staff and a signed copy forwarded to you." Dkt. #67, ¶ 15 and p.66.

Plaintiff filed Grievance No. A-49264-05 (in the form of a letter to Theresa Dyson) concerning the alleged deprivation of his personal property and his placement in a "stripped/modified cell, behind a cell sheild [sic]." On or about August 24, 2005, the IGRC denied the action requested by plaintiff on the grounds that it does not have the authority to order security to release an inmate from a restraint order or deprivation order. Dkt. #66, ¶ 15 and p.68. The IGRC advised plaintiff that the relief requested may only be granted by the Deputy Superintendent of Security. *Id*. The IGRC further advised plaintiff that it could not review the SHU surveillance tapes. *Id*. Finally, the IGRC noted that "upon investigation grievant's action at his 8/9/05 tier hearing posed a threat to staff, hence the restraint order. S.H.U. staff has gone on record to state 'grievant refused his cell set-up on 8/11/05 and, subsequently accepted everything on 8/17/05.'" *Id*. On or about September 2, 2005, defendant Superintendent Conway denied plaintiff's grievance stating "[g]rievant's own behavior warranted the restraint order. No deprivation of property exists since grievant refused to accept it when

originally offered by staff. After several days, grievant finally accepted his cell set up."
Dkt. #53, ¶ 15 and p. 66.

Finally, plaintiff filed Grievance #A-49328-05 on or about August 29, 2005, (in the form of a letter to defendant Dyson), complaining that Corrections Officer Hartman had denied him one meal and that he had been placed behind a cell shield without an order. Dkt. #66, ¶ 16 and pp.76-77. Plaintiff requested that he be transferred to another cell. *Id*. On or about September 7, 2005, the IGRC denied plaintiff's grievance stating, "SHU staff has gone on record stating that 'grievant is receiving all his meals.' I.G.R.C. does not have the authority to order that the surveillance video be preserved, nor can they be reviewed by I.G.R.C. staff. Nor can I.G.R.C. have grievant moved from one cell to another." Dkt. #66, ¶ 16 and p.74. Defendant Superintendent Conway similarly denied plaintiff's grievance on September 14, 2005 stating, "[a]ll of your meals are being given [sic] you, you were not put in a stripped cell or one with a cell shield. The cell shield issue was explained to you by the grievance supervisor personally a day or two after you wrote this grievance." Dkt. #67, ¶ 17 and p.78. Plaintiff appealed defendant Conway's determination to the CORC and following a full hearing of the facts and circumstances and a complete investigation, CORC unanimously upheld the Superintendent's determination. Dkt. #67, ¶ 18 and p.77.

The record before this Court is simply devoid of any evidence to support a conclusion that defendant Conway: participated in any way in the alleged constitutional violations; was informed of the violations and failed to remedy the wrong; created or permitted the continuation of a policy under which unconstitutional practices occurred; was grossly negligent in supervising subordinates who committed the wrongful acts; or exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. Accordingly, because defendant Conway was not personally involved in the alleged constitutional violations, it is recommended that the claims against defendant Conway be dismissed.

### Vincent Rebl, Lisa Trapasso, and Jeffrey Bishop

Vincent Rebl, Lisa Trapasso and Jeffrey Bishop were each listed as defendants in the caption. However, only defendants Lisa Trapasso and Jeffrey Bishop were named specifically in plaintiff's second claim relating to the conditions of plaintiff's confinement. Arguably, Vincent Rebl was incorporated by reference in plaintiff's second claim by reason of his name being mentioned in one of the attachments to the complaint. Notwithstanding the foregoing, Vincent Rebl filed an answer to the complaint. In support of his motion for summary judgment and in opposition to defendants' motion for summary judgment, plaintiff claims that defendants Rebl, Trapasso and Bishop, with others, "repeatedly conspired with defendants Conway, James, Dolce, [ ],Bea, Borawski, Hartman and other prison employees" in the falsification of documents to cover-up the abusive conditions in the SHU. Dkt. #76, p.12. However, plaintiff offers no evidence to support this conclusory statement.

Defendants Rebl, Trapasso and Bishop made rounds with a doctor once a week in the SHU for the period August 9, 2005 through September 9, 2005 and such rounds usually consisted of greeting or speaking with the inmates.  Dkt. #53, ¶ 15; Dkt. #58 ¶ 5; Dkt. #60, ¶ 5; Dkt. #61, ¶ 5.  Prior to plaintiff's placement in the SHU, defendant Bishop had been plaintiff's therapist.  Dkt. #53, ¶ 16; Dkt. #60, ¶ 5; Dkt. #61, ¶ 6.  Defendants Bishop and Trapasso did not work with plaintiff during the period of his confinement in the SHU because plaintiff's "mental health status was inactive."  *Id*. Defendants Rebl, Trapasso and Bishop maintain that they were neither responsible for nor had any input concerning the conditions of plaintiff's confinement.  Dkt. #58, ¶ 6; Dkt. #60, ¶ 6; Dkt. #61, ¶ 8.  During their rounds in the SHU, defendants Rebl, Trapasso and Bishop did not view the conditions of confinement about which plaintiff complains.  Dkt. #58, ¶¶ 6-7; Dkt. #60, ¶ 7; Dkt. #61, ¶ 9.  Moreover, defendants Rebl, Trapasso and Bishop state that they do not recall being contacted by plaintiff to discuss the alleged conditions.  *Id*.  Defendants Rebl, Trapasso and Bishop further argue that they did not have any input regarding the property issued to plaintiff in the SHU.  Dkt. #58, ¶ 7; Dkt. #60, ¶ 8;Dkt. #61, ¶ 10.  Finally, defendants Rebl, Trapasso and Bishop assert that they were neither involved in nor part of any determinations made by DOCS officials as to plaintiff, plaintiff's placement/housing within the facility, plaintiff's property or the conditions of plaintiff's confinement.  Dkt. #58, ¶ 9; Dkt. #60, 9; Dkt. #61, ¶ 11. Accordingly, because plaintiff has offered no evidence whatsoever to support his claims against defendants Rebl, Trapasso and Bishop and the record before this Court is utterly devoid of any evidence that they were personally involved in the alleged

constitutional violations, it is recommended that the claims against defendants Rebl, Trapasso and Bishop be dismissed.

**Sandra Dolce, Darryl Borawski and Thomas Edwards**

In his first claim, plaintiff claims that defendants Sandra Dolce, Darryl Borawski and Thomas Edwards, among others, were "responsible for keeping plaintiff on a restricted diet and deprived of all kosher meals, for three days. Plaintiff was served with a deprivation order seven days later, and was never examined by medical staff, prior to being placed on restricted diet, as is required." Dkt. #1, p.12. In support of their motion for summary judgment, defendants maintain and plaintiff does not dispute that the Food Service Administrator, defendant Don Lopes, bears the sole responsibility for ensuring that inmates who are approved to receive a CAD are, in fact, provided with kosher meals. Dkt. #55, p.9.

There is no dispute that at all times relevant to the instant motion, plaintiff was approved for and participating in the CAD meal plan. On July 27, 2005, plaintiff refused to turn in his utensils following a meal. A misbehavior report was issued and defendant Randy James, then the Deputy Superintendent of Security at Attica, authorized plaintiff's placement on a restricted diet from July 27, 2005 to July 30, 2005. Dkt. #62, ¶ 11. On or about July 27, 2005, defendant James completed a Pre-Hearing Restricted Diet Order, stating that plaintiff was placed on a restricted diet from July 27, 2005 to July 30, 2005 in that "on 7-27-05, you refused to turn in any utensils from the noon meal, which consist of tray made of styrafome [sic], styrafom [sic] cup and a

spork." Dkt. #62, p.31. According to the Pre-Hearing Restricted Diet Order, the placement of plaintiff on a restricted diet was approved by "PA Edwards" at 2:10 pm. *Id*. Defendant Thomas Edwards, a Physician's Assistant at Attica, reviewed plaintiff's medical records and medically approved the restricted diet on July 27, 2005 at 2:10 pm. Dkt. #73, ¶ 6. Moreover, defendant Edwards made a notation in plaintiff's medical records that he was medically cleared for a restricted diet. *Id*. Plaintiff alleges that he was never examined by medical staff prior to being placed on a restricted diet. Dkt. #1. In response, defendant Edwards states,

> [p]ursuant to 7 NYCRR § 304.2(f) and Directive #4933 § 304.2(f), the examination into the state of health of the inmate must be completed within 24 hours of the commencement of the restriction and daily thereafter during the period of restriction. The NYCRR and Directive #4933 do not require a physical examination prior to being placed on a restricted diet as alleged by Inmate George.

Dkt. #73, ¶ 7. According to defendant Edwards, plaintiff was examined on a daily basis after the restricted diet commenced and there were no adverse effects of the diet noted. *Id*. at ¶ 8.

Thus, absent any evidence that defendants Dolce, Borawski and Edwards were involved in any way in the alleged constitutional violation; were informed of the violation and failed to remedy the wrong; created or permitted the continuation of a policy under which unconstitutional practices occurred; were grossly negligent in supervising subordinates who committed the wrongful acts; or exhibited deliberate indifference to the rights of inmates by failing to act on information indicating

unconstitutional acts were occurring, it is recommended that the claims against defendants Dolce, Borawski and Edwards be dismissed.

**First Amendment Claims**

Plaintiff alleges that defendants Conway, Dolce, Borawski, Edwards and Lopes were responsible for keeping him on a restricted diet and depriving him of all kosher meals for three days, July 27, 2005 to July 30, 2005, in violation of his rights under the First Amendment to the United States Constitution.  Moreover, plaintiff further alleges in his second claim against defendants Goord, Eagen, Conway, Dolce, Dyson, Struebel, Hartman, Charitonow, Bishop, Trapasso and Lopes, that his confinement "in a filthy stripped cell, behind an unauthorized cell shield" violated his rights under the First Amendment.  There is nothing in the record before this Court to support plaintiff's assertion that his confinement "in a filthy stripped cell, behind an unauthorized cell shield" could conceivably violate his rights under the First Amendment.  Plaintiff's claims that such confinement violated his rights under the Eighth and Fourteenth Amendments will be addressed below.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir.2003), *citing Pell v. Procunier*, 417 U.S. 817, 822 (1974).  However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system."

*Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir.2006), *citing O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) and *Turner v. Safley*, 482 U.S. 78, 89 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs.[4] *Salahuddin*, 467 F.3d at 474-75. In assessing the sincerity of an inmate's religious beliefs, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989). Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at

---

[4] In *Ford v. McGinnis*, 352 F.3d 582 (2d Cir. 2003), the Second Circuit noted a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, but declined to resolve the issue and instead assumed the continued applicability of the substantial burden test. Recent cases suggest that the Second Circuit resolved the split in *Salahuddin v. Goord* by subscribing to the substantial factor test. *Koehl v. Greene*, No. 05-CV-582, 2008 WL 4822520, *7, n.11 (N.D.N.Y. Oct. 31, 2008); *Livingston v. Griffin*, No. 04-CV-607, 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007); *King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007).

590.  Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny. *Salahuddin*, 467 F.3d at 474-75.  If such a legitimate penological interest is articulated, its reasonableness is then analyzed under the test articulated by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).

Pursuant to *Turner*, the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective.  *Koehl v. Greene*, No. 05-CV-582, 2008 WL 4822520, *7, n.11 (N.D.N.Y. Oct. 31, 2008), *citing Thornburgh v. Abbott*, 490 U.S. 404, 414 (1989).  Then, the court must ask whether the inmate is afforded adequate alternative means for exercising the right in question.  *Thornburgh,* 490 U.S. at 417.  Finally, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison."  *Id*. at 418.

In the instant case, plaintiff claims that defendants Conway, Dolce, Borawski, Edwards and Lopes deprived plaintiff of his kosher meals for a period of three days while plaintiff was placed on a restricted diet.  As discussed above, defendants Conway, Dolce, Borawski and Edwards are entitled to judgment as a matter of law with respect to plaintiff's First Amendment claim for lack of personal involvement.

Accordingly, the only defendant that remains for purposes of plaintiff's First Amendment claim is defendant Lopes.

There is no dispute that at all times relevant to the instant motion, plaintiff was approved for and participating in the CAD meal plan. On July 27, 2005, plaintiff refused to turn in his utensils following a meal, was issued a Misbehavior Report and was placed on a restricted diet until July 30, 2005. Dkt. #53, ¶ 2. Directive 4933 § 304.2(b)(3) provides that an inmate may be placed on a restricted diet when, *inter alia*, an inmate refuses to obey a direct order to return a food container or utensil at the conclusion of a meal while assigned to the Special Housing Unit. Dkt. #53, ¶ 2; Dkt. #67, p.64. The applicable regulations provide that the Superintendent or his designee "may issue a written order placing an inmate reported to have engaged in conduct described in subdivision (b) of this section on a restricted diet for no more than seven days pending the outcome of the inmate's superintendent's hearing." Dkt. #67, p.64. The regulations further provide that "[a] physician, nurse, or physician's assistant, designated by the facility heath services director, must examine the state of health of the inmate within 24 hours of the commencement of the restriction and daily thereafter during the period of restriction." *Id.*

On or about July 27, 2005, defendant James completed a Pre-Hearing Restricted Diet Order, stating that plaintiff was placed on a restricted diet from July 27, 2005 to July 30, 2005, because "on 7-27-05, you refused to turn in any utensils from the noon meal, which consist of tray made of styrafome [sic], styrafom [sic] cup and a

spork." Dkt. #62, p.31.  In support of his motion for summary judgment, plaintiff alleges

that for the three days when he was placed on a restricted diet, he was served non-

kosher "nutri-loaves." Dkt. #23, ¶ 4.  Documentary evidence submitted by defendants

with respect to the instant motions reveals that plaintiff refused the restricted diet on

July 28, 2005 and July 29, 2005 and that plaintiff came off the restricted diet on July 30,

2005.  Dkt. #67, p.61.  Defendants maintain that at the time plaintiff was placed on a

restricted diet, July 27, 2005 to July 30, 2005, no kosher loaf was available at Attica.

Dkt. #53, ¶ 4.  Indeed, defendants submit that Attica did not begin receiving the kosher

loaf for the restricted diet until September 9, 2005.  *Id*.  In sharp contrast, plaintiff

maintains that,

> [d]efendants C. Edwards, Rosolowski, Charitonow, and
> Lopes, were fully aware of the fact that there had never
> been a healthy alternative for kosher foods, and had never
> made a genuine effort to provide plaintiff with an alternative
> to the non-kosher nutri-loaves.  Contrary to the defendants
> [sic] bald assertions, kosher loaves were readily available,
> from the same facility that produces the nutri-loaves for the
> other prisoners in every other state prisons [sic], that were
> on the restricted diet.  The nutri-loaves are made at Eastern
> Correctional Facility then shipped to other prisons.

Dkt. #76, pp.12-13.


Here, in support of their motion for summary judgment, defendants argue

that they did not deliberately deprive plaintiff of his kosher meals and interfere with his

free exercise of religion.  Dkt. #55, pp.15-17.  Specifically, defendants maintain that

plaintiff was properly placed on a restricted diet after he refused to turn in his utensils.

Moreover, defendants insist that no kosher loaf was available for the restricted diet at

Attica until September 9, 2005. Plaintiff disagrees stating that "kosher loaves were readily available, from the same facility that produces the nutri-loaves for the other prisoners..." Dkt. #76, pp.12-13. As required under *Salahuddin*, plaintiff has demonstrated that the disputed conduct, *to wit*, denial of kosher loaf while on a restricted diet, substantially burdened his sincerely held religious beliefs. *Salahuddin*, 467 F.3d at 474-75. In assessing the sincerity of plaintiff's religious beliefs, neither defendants nor the Court may "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989). Instead, courts may only consider whether plaintiff sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590. However, there is nothing in the record before this Court to cause it to consider whether plaintiff sincerely holds his religious beliefs.

Having made the requisite showing, the burden then shifts to the defendants to identify a legitimate penological purpose justifying the decision under scrutiny. *Salahuddin*, 467 F.3d at 474-75. Here, the Court does not dispute that there is a legitimate penological purpose justifying the placement of an inmate on a restricted diet. However, in analyzing its reasonableness under the test articulated by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), this Court cannot conclude that there are no genuine issues of material fact so as to justify granting summary judgment in favor of either party. As described above, under *Turner*, the court

must first determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective. *Koehl v. Greene*, No. 05-CV-582, 2008 WL 4822520, *7, n.11 (N.D.N.Y. Oct. 31, 2008), *citing Thornburgh v. Abbott*, 490 U.S. 404, 414 (1989). Then, the court must ask whether the inmate was afforded adequate alternative means for exercising the right in question. *Thornburgh,* 490 U.S. at 417. Finally, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id*. at 418. Critical to deciding whether plaintiff's rights under the First Amendment were violated is whether kosher loaves were, in fact, available at the time plaintiff was placed on a restricted diet. Accordingly, because genuine issues of fact remain with respect to plaintiff's First Amendment claim concerning his placement on a restricted diet and the failure to provide plaintiff with kosher loaf, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be denied.


**Eighth Amendment Claims**

As discussed at length above in connection with plaintiff's claim that his rights under the First Amendment were violated, plaintiff alleges that his placement on a restricted diet for three days violated his rights under the Eighth Amendment. Additionally, plaintiff claims that his Eighth Amendment right to be free from cruel and unusual punishment was violated by reason of his confinement in a filthy stripped cell behind a cell shield for nine days, deprivation of exercise from August 9, 2005 to

September 27, 2005, denial of cleaning supplies, toiletries, hot water, light, personal property and showers for nine days and denial of sleep and mental health treatment. For the following reasons, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

The Eighth Amendment prohibits cruel and unusual punishment that involves the unnecessary and wanton infliction of pain. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Eighth Amendment to the United States Constitution imposes the duty on prison officials to provide humane conditions of confinement and officials must ensure that inmates receive adequate food, clothing, shelter and medical care. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). In order to prevail on a claim of a violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective component. First, the deprivation must be, objectively, sufficiently serious, such as "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id*. at 834, *citing Rhodes*, 452 U.S. at 347. The second component requires that the prison official have a "sufficiently culpable state of mind." *Id*. In cases such as this, the state of mind is one of deliberate indifference to the health and safety of an inmate. *Id*.

**Restricted Diet**

"Although the Constitution does not require that sentenced prisoners [receive] every amenity which one might find desirable, the Eighth Amendment

prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (internal citations omitted). Under certain circumstances, however, "a substantial deprivation of food may well be recognized as being of constitutional dimension." *Id*. It is well-established that the imposition of a restricted diet does not, standing alone, constitute cruel and unusual punishment in violation of the Eighth Amendment. *H'Shaka v. Drown*, Case No. 9:03-CV-937, (LEK/RFT), 2007 WL 1017275, at *8 (N.D.N.Y. Mar. 30, 2007). Indeed, courts within this Circuit have repeatedly held that placement on a restricted diet for as many as seven days does not rise to the level of an Eighth Amendment violation.[5]

---

[5] *H'Shaka*, 2007 WL 1017275, at *8 (granting defendants' motion for summary judgment on plaintiff's Eighth Amendment claim for seven days on restricted diet); *Smith v. Burge*, Case No. 9:03-CV-0955 (LEK/GHL), 2006 WL 2805242, at *11 n.78 (N.D.N.Y. Sept. 28, 2006) (granting defendants motion for summary judgment on plaintiff's Eighth Amendment claim with respect to his placement on a restricted diet); *McEachin v. McGuinnis*, 357 F.3d 197, 199-201 (2d Cir. 2004) (Eighth Amendment claim properly dismissed where inmate alleged placement on restricted diet for seven days); *Johnson v. Gummerson*, 98-CV-0004, Memorandum-Decision & Order (N.D.N.Y. March 1, 1999) (no Eighth Amendment violation where inmate was placed on restricted diet consisting of "food loaf" for seven days), *aff'd*, 198 F.3d 233 (2d Cir.1999) (unpublished opinion); *Dumpson v. Rourke*, 96-CV-0621, 1997 WL 610652, at *1, 7-8 (N.D.N.Y. Sept. 26, 1997) (no Eighth Amendment violation where plaintiff was placed on restricted "loaf and cabbage" diet for seven days); *Porter v. Coombe*, 97-CV-2394, 1999 WL 587896, at *1, 3 & n. 2 (S.D.N.Y. Aug. 4, 1999) (no Eighth Amendment violation where plaintiff was placed on restricted diet of "cabbage-loaves" for a total of 22 days within a span of two months, even where inmate was allergic to two of the ingredients in the "cabbage-loaves"); *Breazil v. Bartlett*, 998 F.Supp. 236, 240-242 (W.D.N.Y.1997) (no Eighth Amendment violation where inmate was placed on pre-hearing restricted diet consisting of "Nutriloaf" and one cup of raw cabbage for one week [i.e., from 6/27-7/4], and a post-hearing restricted diet consisting of Nutriloaf and cabbage for 45 days); *James v. Coughlin,* 13 F.Supp.2d 403, 412 (W.D.N.Y.1998) (no Eighth Amendment violation where plaintiff was placed on a pre-hearing restricted diet

In the instant case, plaintiff was placed on a restricted diet for three days. There is nothing in the record before this Court to suggest that the restricted diet here caused any health risk to plaintiff or that it was less than nutritionally adequate. Conversely, defendant Physician Assistant Edwards examined plaintiff's medical records, as required by the regulations, and determined that plaintiff was healthy enough to be placed on a restricted diet. Moreover, plaintiff was monitored every day that he was on the diet and no health concerns or adverse effects from the diet were noted. Thus, based on the record before this Court, plaintiff is unable to establish that the deprivation, *to wit*, placement on the restricted diet, was sufficiently serious to satisfy the objective component of an Eighth Amendment violation. Accordingly, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

### **Conditions of Confinement**

Specifically, plaintiff alleges that defendants Conway, Dolce, Dyson, Struebel, Hartman, Bishop and Trapasso all viewed the unsanitary conditions of his confinement and refused to address the violations. Moreover, plaintiff claims that defendants Goord and Eagen were aware of his situation and also failed to address it. According to plaintiff, defendant Hartman withheld plaintiff's meals and defendant Lopes failed to enforce hygienic policies governing food preparation and handling all in violation of his rights under the Eighth Amendment.

---

for three days).

Conditions of confinement inflict cruel and unusual punishment when they result "in unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are "restrictive and even harsh" are "part of the penalty that criminal offenders pay for their offenses against society." *Id*. With respect to the subjective component, a prison official will not be held liable for inhumane conditions, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The Supreme Court of the United States adopted "subjective recklessness" as is used in criminal law as the test for "deliberate indifference" under the Eighth Amendment. *Id*. at 839-40.

Plaintiff was moved from cell BW-22 on the second floor of the SHU to cell CW-18 on the third floor of the SHU after he slipped his restraints during an August 9, 2005 Tier Hearing. Dkt. #53, ¶ 7; Dkt. #70, ¶ 10. Cells on the third floor of the SHU have lexon[6] on the stationary side of the cell and wire mesh on the door. *Id*. Even though there is lexon covering part of the cell, inmates are not considered to be behind a cell shield unless the door is also covered by lexon. *Id*. During his period of confinement in cell CW-18, plaintiff was neither behind a cell shield nor was a cell shield ordered for that cell. Dkt. #53, ¶¶ 7-9. All of plaintiff's property, including his

---

[6] "Lexon" is a material similar to plexiglass, but more durable.

hygienic supplies, was packed up and brought to him. Dkt. #53, ¶ 12. Plaintiff refused

delivery of his property and wanted to be removed from cell CW-18 and have all of his

property examined in front of him. *Id*. To grant such a request would have been

against procedure. *Id*. Despite daily attempts to deliver plaintiff's property, plaintiff

continued to refuse delivery unless his requests were satisfied. *Id*.

On or about August 15, 2005, plaintiff filed Grievance #A-49264-05 (in the

form of a letter addressed to defendant Theresa Dyson) alleging that he had been

deprived of his personal property. Dkt. #53, ¶ 13; Dkt. #66, ¶ 15 and p.69. On or about

August 24, 2005, the IGRC denied the action requested by plaintiff and advised plaintiff

that the relief requested may only be granted by the Deputy Superintendent of Security.

Dkt. #66, ¶ 15 and p.68. Finally, the IGRC noted that "upon investigation grievant's

action at his 8/9/05 tier hearing posed a threat to staff, hence the restraint order.

S.H.U. staff has gone on record to state 'grievant refused his cell set-up on 8/11/05

and, subsequently accepted everything on 8/17/05.'" *Id*. On or about September 2,

2005, defendant Superintendent Conway denied plaintiff's grievance stating

"[g]rievant's own behavior warranted the restraint order. No deprivation of property

exists since grievant refused to accept it when originally offered by staff. After several

days, grievant finally accepted his cell set up." Dkt. #53, ¶ 15 and p. 66.

On or about August 29, 2005, plaintiff filed Grievance #A-49328-05 (in the

form of a letter to defendant Dyson) complaining that Corrections Officer Hartman had

denied him one meal and that he had been placed behind a cell shield without an order.

Dkt. #66, ¶ 16 and pp.76-77. Plaintiff requested that he be transferred to another cell. *Id*. On or about September 7, 2005, the IGRC denied plaintiff's grievance stating, "SHU staff has gone on record stating that 'grievant is receiving all his meals.' I.G.R.C. does not have the authority to order that the surveillance video be preserved, nor can they be reviewed by I.G.R.C. staff. Nor can I.G.R.C. have grievant moved from one cell to another." Dkt. #66, ¶ 16 and p.74. Defendant Superintendent Conway similarly denied plaintiff's grievance on September 14, 2005 stating, "[a]ll of your meals are being given [sic] you, you were not put in a stripped cell or one with a cell shield. The cell shield issue was explained to you by the grievance supervisor personally a day or two after you wrote this grievance." Dkt. #67, ¶ 17 and p.78. Plaintiff appealed defendant Conway's determination to the CORC and following a full hearing of the facts and circumstances and a complete investigation, CORC unanimously upheld the Superintendent's determination. Dkt. #67, ¶ 18 and p.77. Because plaintiff has failed to provide this Court with any evidence that the conditions of his confinement violated the Eighth Amendment, or that the defendants were deliberately indifferent to the conditions of his confinement, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

**Fourteenth Amendment Claims**

To state a cognizable § 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin*, 91 F.3d 349, 351-52

(2d Cir. 1996); *Frazier v. Coughlin*, 81 F.3d 313, 316 (2d Cir. 1996). Plaintiff claims that

his rights under the Fourteenth Amendment were violated because he was placed on a

restricted diet from July 27, 2005 to July 30, 2005 and because he was confined in a

filthy stripped cell behind an unauthorized cell shield. Dkt. #1. Each of the defendants

assert that plaintiff received all the process he was due. Dkt. #55, pp.25-28.


An inmate's liberty interests are generally derived from two sources, the

Fourteenth Amendment Due Process Clause and state statutes or regulations. *Arce v.*

*Walker*, 139 F.3d 329, 333 (2d Cir. 1998).

> With respect to interests arising directly under the Due
> Process Clause, the Supreme Court has narrowly
> circumscribed its scope to protect no more than the [sic] the
> most basic liberty interests in prisoners. The Due Process
> Clause does not protect against every change in the
> conditions of confinement having a substantial adverse
> impact on inmates, if those changes are within the normal
> limits or range of custody which the conviction has
> authorized the State to impose. Instead, the Due Process
> Clause protects against restraints or conditions of
> confinement that exceed [ ] the sentence in ... an
> unexpected manner.

*Id*. (Internal quotation marks and citations omitted). In the instant case, plaintiff has

failed to identify a protected liberty interest in that he has failed to show how the

conditions of his confinement exceed his original sentence. Moreover, even if plaintiff

could demonstrate a protected liberty interest, which he clearly cannot, plaintiff cannot

demonstrate that he was deprived of anything without due process of law. As

discussed above, plaintiff filed grievances concerning his placement on a restricted diet

and the conditions of his confinement.  Each of those grievances was fully investigated and found to be without merit.

In order to establish the existence of a protected liberty interest under a state statute or regulation, an inmate must show that his confinement: "(1) creates an atypical and significant hardship ... in relation to the ordinary incidents of prison life, and (2) that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Arce v. Walker*, 139 F.3d 329, 334 (2d Cir. 1998) (internal quotations marks and citations omitted).  Neither plaintiff's motion for summary judgment nor plaintiff's opposition to defendants' motion for summary judgment demonstrate that the placement of plaintiff on a restricted diet for three days or the conditions of his confinement created an atypical and significant hardship.  Accordingly, because plaintiff has failed to show that he was deprived of a protected liberty interest without due process and that the alleged deprivation created an atypical and significant hardship, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

## CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that plaintiff's motion for summary judgment (Dkt. #22) be **DENIED** in its entirety.  It is further **RECOMMENDED** that defendants' cross-motion for summary judgment (Dkt. #52) be **DENIED** with

respect to plaintiff's first claim (restricted diet) for a violation of his rights under the First Amendment against defendant Don Lopes and **GRANTED** in all other respects.

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order</u>. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local

Rules for the Western District of New York, "written objections shall specifically identify

the portions of the proposed findings and recommendations to which objection is made

and the basis for such objection and shall be supported by legal authority."  Failure to

comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of

Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report,

Recommendation and Order), may result in the District Judge's refusal to consider the

objection.


The Clerk is hereby directed to send a copy of this Order and a copy of

the Report and Recommendation to counsel for the parties.


**SO ORDERED.**

DATED:     Buffalo, New York
           March 31, 2009


                              **s/ H. Kenneth Schroeder, Jr.**
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**